No. 15-872 T
(Judge Edward J. Damich)

---

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

MINDY P. NORMAN,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

_____

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

DAVID A. HUBBERT
Acting Assistant Attorney General

DAVID I. PINCUS
JASON BERGMANN
BLAINE G. SAITO
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C.  20044
(202) 353-7125
(202) 514-9440 (facsimile)

---

---

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

II.    STATEMENT OF FACTS ....................................................................................................... 3

   A.   Norman's Swiss bank account ..................................................................................... 3

   B.   Norman's relationship with her accountants and her tax returns....................................... 5

      1.   Norman's engagement of Saul and her 2007 income tax return..................................... 5

      2.   Norman's engagement of Kay ................................................................................. 6

      3.   Norman's "quiet disclosure" with Kraft ................................................................. 7

   C.   The IRS audit and the current litigation................................................................... 8

III.    STANDARD OF REVIEW ..................................................................................................... 9

IV.    LEGAL BACKGROUND ON THE FBAR PENALTY ..................................................... 11

V.    ARGUMENT................................................................................................................................ 14

   A.   Norman had a foreign bank account in 2007 and was therefore required to file an FBAR no later than June 30, 2008. ......................................................................................... 14

   B.   Norman willfully failed to file an FBAR for the 2007 calendar year. .............................. 14

      1.   Norman recklessly failed to file a 2007 FBAR............................................................ 15

         a.   Norman had constructive knowledge of the FBAR requirement and actual and constructive knowledge of the UBS account. ..................................................... 17

         b.   Norman falsely answered a question on Schedule B of her tax return and she failed to review her return before filing it. ................................................................. 18

         c.   Other undisputed facts bolster the conclusion that Norman acted willfully. ........... 19

      2.   Norman acted with willful blindness to her duty to file a timely FBAR. .................... 21

      3.   Norman's failure to file her FBAR was voluntary, rather than accidental. .................. 24

   C.   Norman's failure to file an FBAR is not excused by reasonable cause. ........................... 26

   D.   Norman's failure to take advantage of OVDP to reduce her potential FBAR penalties is irrelevant. ......................................................................................................................... 27

VI.    CONCLUSION............................................................................................................................ 29

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ass'n of Irritated Residents v. E.P.A.*,
   494 F.3d 1027 (D.C. Cir. 2007) ...................................................................28, 29

*Bedrosian v. United States*,
   No. 2:15-cv-05853, 2017 WL 3887520 (E.D. Pa. Sept. 5, 2017) ..........................................17

*Cook v. United States*,
   46 Fed. Cl. 110 (2000) ...............................................................................10

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...............................................................................28, 29

*Johnson v. United States*,
   734 F.3d 352 (4th Cir. 2013) ...........................................................................10

*Kobus v. United States*,
   103 Fed. Cl. 575 (2012) .......................................................................9, 15, 22

*Estate of Liftin v. United States*,
   111 Fed. Cl. 13 (2013) ..............................................................................24

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ................................................................................14, 15

*Sale v. United States*,
   31 Fed Cl. 726 (1994) ...............................................................................10

*Stobie Creek Investments LLC v. United States*,
   608 F.3d 1366 (Fed. Cir. 2010) ........................................................................26

*United States v. Bohanec*,
   No. 2:15-cv-4347, 2016 WL 7167860 (C.D. Cal. 2016) .....................................................17, 19

*United States v. McBride*,
   908 F. Supp. 1186 (D. Utah 2012) ................................................................. *passim*

*United States v. Williams*,
   489 Fed. Appx. 655 (4th Cir. 2012) (unpublished) ..............................................10, 16, 17, 19

*Verret v. United States*,
   542 F. Supp. 2d 526 (E.D.Tex. 2008) ...................................................................11

**Federal Statutes**

31 U.S.C. § 5314 ........................................................................................................12

31 U.S.C. § 5321 ................................................................................................. *passim*

I.R.C. § 61(a) ...........................................................................................................11

I.R.C. § 6672 ......................................................................................................10, 15

Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114 (1970) (31 U.S.C. §§ 5311
    *et seq.*) ...............................................................................................................11

**Regulations**

26 C.F.R. § 1.1-1 ......................................................................................................11

31 C.F.R. § 103.24 ...............................................................................................12, 14

31 C.F.R. § 103.27 ...............................................................................................12, 14

31 C.F.R. § 103.56 ....................................................................................................13

31 C.F.R. § 1010.306 .................................................................................................12

31 C.F.R. § 1010.350 .................................................................................................12

**Other Authorities**

H.R. Rep. No. 91-975 (1970) ......................................................................................11

I.R.M. § 9.5.11.9 ......................................................................................................28

Internal Revenue Service, *Voluntary Disclosure: Questions and Answers* (May 6,
    2009, amended Jun. 24, 2009, Jul. 31, 2009, Aug. 25, 2009, Jan. 8, 2010) ....................13, 28

## EXHIBIT LIST

Exhibit 1     UBS Opening of an Account/Custody Agreement Form

Exhibit 2     UBS Verification of the Beneficial Owners Identity, Form A

Exhibit 3     UBS Asset Management Agreement - Application Form

Exhibit 4     UBS Portfolio Management Agreement 10/08/2002

Exhibit 5     UBS Assets and Income Declaration for US Taxable Persons

Exhibit 6     UBS Waiver of Right to Invest in US Securities

Exhibit 7     Documents of UBS Transactions

Exhibit 8     UBS Asset Management Agreement 06/27/2005

Exhibit 9     UBS Asset Management Agreement 12/13/2005

Exhibit 10   UBS Asset Management Agreement 06/21/2007

Exhibit 11   UBS General Power of Attorney form

Exhibit 12   UBS Income Statement USA

Exhibit 13   UBS Statement of Assets as of 31 December 2007 - Sub Account 01

Exhibit 14   UBS Statement of Assets as of 31 December 2007 - Sub Account 03

Exhibit 15   Closing of UBS Account

Exhibit 16   Wire Transfer Dated 07/18/2008

Exhibit 17   Original 2007 Tax Return

Exhibit 18   Amended 2007 Tax Return

Exhibit 19   Statement of Norman 04/01/2012

Exhibit 20   IRS Interview Notes 03/27/2012

Exhibit 21   Statement of Norman 01/21/2014

Exhibit 22   Mindy Norman Driver's License & Passport

Exhibit 23   Identification Documents

Exhibit 24   IRS Appeals Denial Letter

Exhibit 25   2008 Tax Organizer Form

Exhibit 26   Original 2008 Tax Return

Exhibit 27   Amended 2008 Tax Return

Exhibit 28   UBS Banker Notes

Exhibit 29   Delinquent FBARs

Exhibit 30   Kraft Invoice

Exhibit 31   UBS Monthly Balances

Exhibit 32   UBS Trades

Exhibit 33   UBS Deferred Prosecution Agreement

Exhibit 34   Mindy Norman Deposition Transcript

Exhibit 35   Michael Saul Deposition Transcript

Exhibit 36   Barry Kay Deposition Transcript

Exhibit 37   IRS Assessment

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
_____

No. 15-872 T
(Judge Edward J. Damich)

MINDY P. NORMAN,

Plaintiff,

v.

THE UNITED STATES,

Defendant.
_____

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
_____

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

This tax case involves a penalty that the IRS assessed against Mindy Norman for her

willful failure to file a Foreign Bank Account Report (or "FBAR"). In 2007, Norman had over

$1.6 million in a Swiss bank account. The law required Norman to disclose her foreign bank

account on a report filed with the Treasury Department no later than June 30, 2008. She did not

file the report. Rather, Norman declared under penalty of perjury on her income-tax return that

she did ***not*** "have an interest in or a signature or other authority over a financial account in a

foreign country" "at any time during 2007." (Def. Ex. 17 at 7.)

The crux of the parties' dispute is whether Norman's failure to file an FBAR for 2007

was "willful" and whether, as a result, the IRS properly assessed Norman with a willful-violation

penalty under 31 U.S.C. § 5321(a)(5)(C). In her Complaint, Norman alleged that her failure to

file the report was not willful, because the Swiss bank account "was owned by plaintiff's mother,

Bella Hahn, at all times until her death in 2011," and Norman "did not consider the money to be

hers, and did not consider herself to have control over the account." (Dkt. No. 1, ¶¶ 12, 14.)

1

However, Norman later admitted during her deposition that the allegation was *false*. In particular, Norman testified that, in addition to her mother's Swiss bank account, Norman knew that she "had her own account as well," and Norman had considered the money in that account to be her own. (Def. Ex. 34 at 154:22-155:18.)

As a result, the factual basis of Norman's claim that she was not willful has now evaporated. Although willfulness is generally a fact question, here there is no need for a trial. As defendant will show, there "is no dispute as to any material fact" and defendant is therefore "entitled to judgment as a matter of law." RCFC 56(a). It is beyond dispute that Norman: (1) knew that she had funds in her own Swiss bank account; and (2) despite that knowledge, did not report her interest in the account on a timely FBAR, instead representing falsely on her income-tax return that she had no foreign bank accounts.

By themselves, those facts establish that Norman's failure to file the FBAR was willful. But other undisputed facts further support the same conclusion. For example, there is a wealth of documentary evidence that Norman both was aware of and actively managed her Swiss bank account. Indeed, Norman routinely met with Swiss bankers and, on one occasion, a banker delivered a cash withdrawal to her in person. Moreover, Norman's undisputed actions demonstrate her clear intent to conceal the account from U.S. authorities. Norman did not maintain the account in her own name; rather, the account was referred to only by number, providing anonymity for Norman's financial transactions. Norman further hid the account from the United States by instructing the Swiss bank not to invest in U.S. securities, ensuring that her investment transactions would not be reported to the IRS. Norman artfully failed to tell her New York accountants that she had a foreign bank account, or that she had earned foreign income on transactions in the account, thereby reducing the income reported on her tax returns. And,

Norman further tried to cover up the Swiss bank account by falsely telling the IRS that the account had belonged to her mother and that Norman only learned of its existence in 2009.

A taxpayer failing to file a timely FBAR acts willfully, and is subject to a penalty under 31 U.S.C. § 5321(a)(5)(C), if he or she (1) recklessly disregarded the legal duty to file the report; (2) was willfully blind to the legal obligation and to the facts giving rise to the obligation; or (3) failed to file the report voluntarily, and not accidentally. Here, the undisputed facts prove beyond all doubt that Norman was willful under all three standards. For that reason, the Court should enter a summary judgment in defendant's favor on the claims in Norman's Complaint.

## II. STATEMENT OF FACTS

### A.  Norman's Swiss bank account

Mindy Norman is a U.S. citizen. (Def. Exs. 22; 23.) Norman opened an account at UBS AG ("UBS"), a Swiss bank, in 1999. (Def. Exs. 1; 2.) She was the beneficial owner of the account, and the account was a so-called numbered account, for which UBS omitted Norman's name and address from the bank statements. (Def. Exs. 1; 2; 12; 13; 14.) By 2007, Norman's UBS account had a high balance of at least $1,607,060. (Def. Ex. 31.)

Over the years, Norman executed trading authorizations and other documents related to the account. For example, in a document she signed in 2000, Norman waived her right to invest her UBS account in U.S. securities. (Def. Ex. 5.) UBS applied that request to additional subaccounts that Norman created. (Def. Ex. 6.) Norman executed various management agreements with UBS regarding her account and subaccounts. (Def. Exs. 8; 9; 10.) She signed documents ordering that UBS undertake investments in her account. (Def. Ex. 7.) UBS followed through on those instructions and executed numerous trades on Norman's behalf. (Def. Ex. 32.)

Norman worked with a banker at UBS named Hans Thomann. (Def. Ex. 34 at 46:16–47:12.) On one occasion, Norman withdrew money from her UBS account in cash, which

Thomann delivered to her in person. (Def. Ex. 34 at 53:12–55:4.) Norman also worked with another banker at UBS named Dietrich Lutoff. (Def. Ex. 34 at 48:12–22, 65:11–66:7.) UBS business records report numerous contacts between Norman and UBS bankers, including questions from Norman as to why her account was not performing as well as a separate UBS account held by her mother. (Def. Ex. 28.)

The United States began an investigation of the role played by UBS in facilitating tax evasion by wealthy Americans, such as Norman, who hid their assets in secret UBS accounts. As a result of the investigation, UBS announced that it would cease providing private banking services to U.S. clients as of July 2008. (Def. Ex. 33 at 41.) In April 2008, Norman learned about the new business model, and she told a UBS banker that she was unhappy with the situation. (Def. Ex. 28 at 2.) At that time, Norman told UBS that she wanted her account to be invested in liquid assets outside of the United States, and not in securities. (Def. Ex. 28 at 2.) The investigation culminated in a deferred prosecution agreement between UBS and the United States in which UBS agreed to provide documents regarding its clients to U.S. authorities. (Def. Ex. 33 ¶ 9.) UBS also admitted that certain private bankers, like Thomann, had aided their clients in evading U.S. taxes. (Def. Ex. 33 ¶ 2.)

Around the time that UBS had announced it was ending its cross-border business, and Norman had expressed her displeasure in changes in the UBS business model, Norman learned that Thomann had moved to Wegelin & Co. ("Wegelin"), another Swiss bank. (Def. Ex. 34 at 97:7–98:12.) Norman signed a document dated July 8, 2008, closing her UBS account and transferring the assets to a new account at Wegelin. (Def. Ex. 15.) The document states that Norman's decision was final and that she was "NOT to be contacted." (Def. Ex. 15 (emphasis in

original).) On July 18, 2008, UBS closed Norman's account and transferred the funds to an account at Wegelin. (Def. Ex. 16.)

### B.   Norman's relationship with her accountants and her tax returns

Norman used three different accountants during relevant periods: (1) Michael Saul (New York); (2) Barry Kay (New York); and (3) Steven Kraft (Switzerland).

### 1.   Norman's engagement of Saul and her 2007 income tax return

Norman timely signed, under oath, and filed her Form 1040 U.S. Individual Income Tax Return for the 2007 tax year in April of 2008. (Def. Ex. 17 at 5.) Michael Saul signed as the return preparer, as shown below:

| Sign Here | Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge. | | | | |
|---|---|---|---|---|---|
| Joint return? See page 13. Keep a copy for your records. | Your signature *Mindy P. Nom* | Date 4-12-08 | Your occupation TEACHER | | Daytime phone number |
| | Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | | |
| Paid Preparer's Use Only | Preparer's signature *Michael P. Saul* | Date APR 10 2008 | Check if self-employed ☐ | Preparer's SSN or PTIN P00236107 |
| | Firm's name (or yours if self-employed), address, and ZIP code 710002 11-05-07 | MARKS PANETH & SHRON LLP, CPAS 88 FROEHLICH FARM BLVD WOODBURY, NEW YORK 11797 | | EIN 11-3518842 | Phone no. 516-992-5900 |

(Def. Ex. 17 at 5.) On Schedule B, Part III, Line 7a, the Form asked whether Norman had "at any time during 2007 . . . an interest in or a signature or other authority over a financial account in a foreign country . . . ." Norman responded "No" to that question, as shown below:

| Part III Foreign Accounts and Trusts | You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; or (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | Yes | No |
|---|---|---|---|
| | 7a  At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 | | X |
| | b  If "Yes," enter the name of the foreign country ▶ | | |
| 727501 11-06-07 | 8  During 2007, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See page B-2 | | X |

(Def. Ex. 17 at 7.)

Saul knew that U.S. taxpayers who had interests in foreign financial accounts were required to file an FBAR. (Def. Ex. 35 at 9:25–10:13.) In preparing Norman's 2007 return, Saul

followed his standard practice of providing to Norman a tax organizer asking specific questions and requesting specific documents. If Saul's clients failed to answer any of his questions, it was Saul's practice to follow up with them. (Def. Ex. 35 at 11:15–12:6, 15:12–15.) Saul's regular tax organizer had a page containing a question that mirrored the language of the question on Schedule B, Part III, Line 7a, inquiring about interests in foreign bank accounts. (Def. Ex. 25[1] at 17, 27.) Because Norman had interest income in 2007, the organizer Saul provided to Norman would likely have included that page. (Def. Exs. 25 at 27; 35 at 26:4–24.)

According to Saul, Norman did not tell him about her Swiss bank account before he prepared her original 2007 tax return. (Def. Ex. 35 at 16:14–16.) Indeed, Saul testified that if Norman had advised Saul that she had a Swiss bank account, he would have spoken with her about matters like her FBAR obligations. (*See* Def. Ex. 35 at 22:9–23:13 (testifying that if he knew of the UBS documents that Norman signed, it would have prompted a discussion regarding the foreign account question on Schedule B, Part III, Line 7a).) Norman testified that she went to Saul and "just gave [him] the stuff," and that after Saul had prepared her return, she signed and filed it without taking any time to review it. (Def. Ex. 34 at 107:6–16, 108:6–109:17.)

### 2.  Norman's engagement of Kay

Norman stopped using Saul, and she used Barry Kay for her 2008 and later returns. (Def. Exs. 25; 26 at 2.) In March of 2009, Kay timely prepared a return for Norman's 2008 year. The same foreign account question appeared on Schedule B, Part III, Line 7a, of that return, and again Norman answered "No." (Def. Ex. 26 at 2, 4.)

---

[1] Def. Ex. 25 is a blank tax organizer that Saul's firm sent to clients for their 2008 tax year. Norman's specific organizer for the 2007 tax year and a blank version of Saul's 2007 organizer were unavailable, due to his firm's document retention policy. (Def. Ex. 35 at 24:6–15.) But Saul stated that the same question was likely on his firm's 2007 organizer. (*See* Def. Ex. 35 at 14:12–17.)

Kay also knew about the FBAR requirement, and he had previously prepared FBARs for some of his clients. (Def. Ex. 36 at 11:11–12:3, 13:13–22.) Kay also provided his clients with a tax organizer. However, he usually did not follow up with clients who did not complete the question on foreign accounts, unless he thought that there was a high probability that the client had a foreign account (*e.g.*, if the client was a non-U.S. citizen or had foreign activities). (Def. Ex. 36 at 12:4–23.) Because Kay did not have such suspicions about Norman, he did not raise the foreign account question with her. (Def. Ex. 36 at 15:15–25, 26:16–19.) Thus, Kay was unaware of Norman's UBS account at the time he prepared her 2008 return. (Def. Ex. 36 at 18:11–19:6.)

### 3.   Norman's "quiet disclosure" with Kraft

While Norman maintained an engagement with Kay, Norman separately hired Steven Kraft, a CPA in Switzerland. Thomann, Norman's former UBS banker, had referred Norman to Kraft. (Def. Ex. 34 at 114:7–23.) In December of 2008, Kraft undertook a so-called "quiet disclosure" for Norman, for which he prepared amended tax returns and FBARs for the years 2003 to 2008, but did not affirmatively alert the IRS about those filings. (Def. Ex. 30.) Kraft's preparation of the amended returns and FBARs took, according to an invoice for "professional services rendered," 52.5 hours, at a price of 23,625.00 Swiss Francs (about $23,600). (Def. Ex. 30.) Kraft instructed Norman to file the amended returns and pay back taxes and interest, but no penalties. (Def. Ex. 30.)

Norman signed and filed an amended return for the 2007 year on December 21, 2009. (Def. Ex. 18 at 1.) The amended 2007 return disclosed previously omitted foreign-sourced interest, dividends, and capital gains. (Def. Ex. 18 at 2, 6–11.) The amended return reported significant capital gains transactions that Norman had failed to include in her original return. (Def. Ex. 18 at 7–11.) In addition, Norman changed her answer to "Yes" on Schedule B, Part III,

Line 7a, and she filed a delinquent FBAR. (Def. Ex. 18 at 6; Def. Ex. 29.) Norman also filed

delinquent FBARs for the years 2003 to 2008. (Def. Ex. 29.)

Norman did not tell Kay about her relationship with Kraft until after she had filed the

"quiet disclosure." (Def. Ex. 36 at 22:3–23:12.) Norman also did not provide Kay with copies of

her amended returns, and Kay only received them later after he had received a notice of an IRS

audit. (Def. Ex. 36 at 22:3–23:12.)

### C.   The IRS audit and the current litigation

UBS provided documents regarding Norman to the United States pursuant to its deferred

prosecution agreement. (Def. Ex. 33 ¶ 9.) The IRS thereafter audited Norman regarding her

compliance with her FBAR obligations. Eventually, in 2012, an IRS revenue agent interviewed

Norman in the presence of Kay. (Def. Ex. 20.) During the interview, Norman falsely stated that

she "did not know about the UBS account until 2009 when her mother told her about the

existence of such account and the need to report it on tax returns." (Def. Ex. 20 at 6, 8.) Norman

further stated that "while her mother was alive she recalled signing documents at her mother's

request, but [Norman] was not allowed to question the parents out of respect." (Def. Ex. 20 at 6,

8.) Norman reiterated, in a written statement she signed and sent to the revenue agent, that she

"never knowingly signed any forms for a foreign bank account," but merely signed whatever her

mother gave her without question. (Def. Ex. 19.) Norman stated that she was "shocked to first

hear about the existence of the foreign accounts" when her mother first told her about the

accounts "sometime in 2009." (Def. Ex. 19.)

Later during the audit, Norman retained James Druker, her current counsel of record. In

October 2003, based on Norman's willful failure to file an FBAR for the 2007 year, the IRS

assessed an FBAR penalty of $803,530 against her. (Def. Ex. 37.) After the IRS had assessed the

willful FBAR penalty, Norman submitted a second written statement to the IRS "to correct

several misstatements" in her prior signed statement. (Def. Ex. 21 at 2.) In the second written

statement, Norman admitted that she "had signing authority" over an account at UBS for "more

than a decade." (Def. Ex. 21 at 2.) Norman stated that her name had been added to her mother's

UBS account "in case anything happened to her," but stated that "none of the money in the Swiss

account(s) was" hers and she "did not consider herself to have any kind of control over the

account." (Def. Ex. 21 at 2–3.) The IRS Office of Appeals sustained Norman's FBAR penalty in

July 2015. (Def. Ex. 24.) Norman paid the penalty, and she filed suit in this Court in August

2015. (Dkt. No. 1.)

In her deposition in this case, Norman admitted that her second written statement to the

IRS was not entirely true. Although Norman characterized her second written statement as being

"essentially true," she admitted that—despite her representation to the contrary—she knew that

she "had [her] own account" at UBS. (Def. Ex. 34 at 142:13–143:5.) Norman testified further

that, in addition to her mother's Swiss bank account, Norman was aware that she "had her own

account as well," and Norman had considered the money in that account to be her own. (Norman

Depo. at 154:22–155:18.) Norman admitted that, at least annually, she discussed her UBS

account with Thomann in person, and she also discussed the account with Thomann by telephone

"a couple of times." (Def Ex. 34 at 46:2–47:12.) And, belying her representation that she "did

not consider [herself] to have any control over the account" (Def. Ex. 21 at 2), Norman testified

that she had personally "made a withdrawal" from her UBS account in cash. (Def. Ex. 34 at

53:12-55:4.)

### III.   STANDARD OF REVIEW

"The general rule in tax cases is that assessments made by the IRS are presumed to be

correct, and therefore, the taxpayer bears the burden of proof." *Kobus v. United States*, 103 Fed.

Cl. 575, 585 (2012). As with all tax refund claims, the Court will conduct a *de novo* trial of

factual issues, with no weight given to the subsidiary findings by the Service in its administrative proceedings. *Cook v. United States*, 46 Fed. Cl. 110, 113 (2000); *see also United States v. McBride*, 908 F. Supp. 1186, 1201 (D. Utah 2012) (holding that, in affirmative civil action by Government to recover civil FBAR penalty, the court should consider the willfulness issue *de novo* "and not on any record developed at the administrative level").

Here, the Court may resolve the willfulness question on summary judgment, rather than at trial, if "there is no genuine issue as to any material fact" and the Government is "entitled to judgment as a matter of law." RCFC 56(a). Indeed, where the pertinent facts were undisputed, numerous courts have sustained civil penalties by the IRS on summary judgment, based on determinations that taxpayers had acted willfully. For example, *United States v. Williams*, 489 Fed. Appx. 655, 659 (4th Cir. 2012) (unpublished), reversed a district court's judgment that a taxpayer was not liable for FBAR penalties, holding based on "the evidence as a whole" that the district court had "clearly erred in finding that [the taxpayer] did not willfully violate § 5314." The Fourth Circuit's holding was based in part on undisputed evidence that the taxpayer knew that he had ownership of funds deposited in Swiss bank accounts, and that the taxpayer had falsely told his accountant on a tax organizer and falsely represented on Form 1040 that he had no interests in any foreign bank accounts. *Id.*

Similarly, numerous courts have determined, on motions for summary judgment, that taxpayers were liable for trust-fund-recovery penalties under I.R.C. § 6672 based on undisputed evidence of willfulness. For example, the Fourth Circuit affirmed a summary judgment in the Government's favor in *Johnson v. United States*, 734 F.3d 352, 365 (4th Cir. 2013), where "even viewing the evidence in the light most favorable" to the taxpayer, "the record allow[ed] no conclusion other than that the failure to pay the payroll taxes was willful . . . ." In *Sale v. United*

*States*, 31 Fed Cl. 726, 732 (1994), this Court granted summary judgment to the United States in

a trust-fund recovery case, where "the undisputed facts . . . clearly indicat[ed] that [the taxpayer]

voluntarily, consciously, and intentionally chose to withhold payment" of employment taxes to

the IRS. Likewise, in *Verret v. United States*, 542 F. Supp. 2d 526, 543 (E.D.Tex. 2008), a

district court granted summary judgment to the United States in a trust-fund penalty case. There,

"averments" that the taxpayer lacked knowledge of his business's employment-tax deficiencies

were "contradict[ed by] the evidentiary record," in particular by admissions made during the

taxpayer's deposition. *Id.* at 540-41. Based on that undisputed evidentiary record, the district

court held that the taxpayer's "gross negligence or reckless disregard" constituted "a willful

failure to collect" the trust-fund taxes. *Id.* at 542.

## IV.   LEGAL BACKGROUND ON THE FBAR PENALTY

U.S. citizens such as Norman are subject to taxation on their worldwide income,

regardless of where the income is earned. *See* I.R.C. § 61(a); 26 C.F.R. § 1.1-1(b). To ensure

compliance with that requirement, the Form 1040, U.S. Individual Income Tax Return, requires

taxpayers to specify whether they had "an interest in or a signature or other authority over a

financial account in a foreign country." *See* IRS Form 1040, Schedule B, Part III, line 7 (Dep.

Ex. 17 at 7.) The return then directs taxpayers to review the filing requirements for Form TD F

90-22.1, the Report of Foreign Bank and Financial Accounts, commonly known as the FBAR.

The requirement to report interests in foreign bank accounts arises under the Bank

Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114 (1970) (31 U.S.C. §§ 5311 *et seq.*). The

legislative history indicates that Congress viewed the Bank Secrecy Act as a means of

combatting tax evasion and other crimes. *See* H.R. Rep. No. 91-975 (1970), reprinted in 1970

U.S.C.C.A.N. 4394, 4397–98 (observing that "[s]ecret foreign financial facilities, particularly in

Switzerland" offered the wealthy a "grossly unfair" but "convenient avenue of tax evasion").

The reporting provisions are contained in Title 31 ("Money and Finance") of the United States Code. Section 5314(a) provides that the Secretary of the Treasury "shall require a . . . citizen of the United States . . . to . . . file reports . . . when the . . . citizen . . . makes a transaction or maintains a relation for any person with a foreign financial agency." The statute specifies, among other things, that the reports "shall contain . . . the identity and address of the participants in a transaction or relationship." 31 U.S.C. § 5314(a)(1).

Section 5314(b) authorizes the Treasury Secretary to prescribe regulations implementing the statute. The Secretary exercised that authority by requiring that citizens with a financial interest in, or signature or other authority over, a foreign financial account "shall report such relationship to the Commissioner of the Internal Revenue for each year in which such relationship exists, and shall provide such information as shall be specified in a reporting form prescribed by the Secretary to be filed by such persons." 31 C.F.R. § 103.24(a).[2] The prescribed form, Form TD F 90.22-1, must be filed on or before June 30 of the following year. 31 C.F.R. § 103.27(c). A U.S. citizen must file the FBAR if the aggregate value of his or her foreign accounts exceeded $10,000 at any time during the calendar year at issue. *Id.*

As in effect for the year at issue, 31 U.S.C. § 5321(a)(5)(A) imposes "a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." For willful violations, the maximum penalty imposed is the greater of: (1) $100,000, or (2) fifty percent of the "balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(C), (a)(5)(D). For non-willful violations, the penalty may not exceed $10,000. 31 U.S.C. §

---

[2] The regulations governing the FBAR were published as cited above during the year at issue in this case, but were recodified in a new chapter in 2011. *See* 31 C.F.R. §§ 1010.350(a), 1010.306(c). The text of the regulations in force at the time is provided in the Appendix of Statutes, Regulations, and Other Authorities.

5321(a)(5)(B). The IRS has been delegated authority to assess and collect the penalty. 31 C.F.R. § 103.56(g).

In 2009, the IRS implemented the Offshore Voluntary Disclosure Program, or "OVDP." The OVDP was an administrative program, exercised at the discretion of the IRS, pursuant to which certain "taxpayers with undisclosed foreign accounts" could "make a voluntary disclosure" in exchange for leniency in the application of FBAR penalties. Internal Revenue Service, *Voluntary Disclosure: Questions and Answers*, No. 3 (May 6, 2009, amended Jun. 24, 2009, Jul. 31, 2009, Aug. 25, 2009, Jan. 8, 2010), https://www.irs.gov/uac/voluntary-disclosure-questions-and-answers (*hereinafter* "OVDP Q&A"). Under OVDP, a taxpayer who failed to file FBARs and report foreign income could notify the IRS of the failure in writing, include accurate amended returns and delinquent FBARs, and show willingness, in writing, to cooperate in determining the proper tax liability and paying all applicable taxes, interest, and penalties. OVDP Q&A Nos. 3, 4, 9, 12, 24, 25. The process required a taxpayer to comply "truthfully, timely, and completely" with the provisions outlined by the IRS, and required more than merely filing corrected amended returns. OVDP Q&A Nos. 4, 50. The IRS included in its questions and answers outlining the 2009 OVDP a sample letter for notifying the IRS about a taxpayer's desire to enter into OVDP that included the willingness to pay penalties and other necessary information. OVDP Q&A No. 6. If the IRS exercised its discretion to allow a taxpayer to participate in OVDP, if the taxpayer qualified for the program, and if the taxpayer complied with all of the program's requirements, the taxpayer's FBAR penalties could be reduced to twenty percent (rather than fifty percent) of the account balance. OVDP Q&A No. 12.

# V. ARGUMENT

**A.   Norman had a foreign bank account in 2007 and was therefore required to file an FBAR no later than June 30, 2008.**

Under the governing regulations, a "person subject to the jurisdiction of the United States . . . having an interest in, or signature authority" over a foreign financial account with a value exceeding $10,000 during a calendar year, must file an FBAR by June 30 of the next calendar year. 31 C.F.R. §§ 103.24(a), 103.27(c). It cannot be disputed that this requirement applied to Norman for the 2007 calendar year. First, as a U.S. citizen, Norman was "under the jurisdiction of the United States." (Def. Ex. 23.) Second, during 2007, Norman had both an interest in and signatory authority over her own UBS account. (Def. Ex. 2.) Third, because UBS is a Swiss bank, the account at issue was a foreign financial account. (*E.g.*, Def. Exs. 1; 2.) Fourth, the $1.6 million balance in Norman's account was far in excess of $10,000. Norman does not dispute these facts.

**B.   Norman willfully failed to file an FBAR for the 2007 calendar year.**

It is undisputed that Norman did not file an FBAR for the 2007 year on or before June 30, 2008, as the regulations required. Rather, Norman limits her challenge to whether she acted "willfully" within the meaning of 31 U.S.C. § 5321(a)(5).

The text of the statute does not define the term "willful" or "willfully." 31 U.S.C. § 5321(a)(5). When interpreting the term in other contexts, the Supreme Court has held that "'willfully' is a word of many meanings whose construction is often dependent on the context in which it appears." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). Courts have outlined three alternative tests and standards for willfulness in the FBAR context. The standards are: (1) reckless disregard of a legal duty, (2) willful blindness to a legal duty and the attendant facts, and (3) failing to comply with a legal duty voluntarily rather than accidentally. Under any of the

three standards, the government can show willfulness "through inference from conduct meant to conceal or mislead sources of income or financial information." *McBride*, 908 F. Supp. 2d at 1210 (quoting *United States v. Sturman*, 951 F.2d 1466, 1476–77 (6th Cir. 1991)). Drawing on circumstantial evidence and reasonable inferences is often necessary "because direct proof of the [violator]'s intent is rarely available." *Id.*

Defendant will show, based on undisputed evidence, that Norman's conduct was willful under all three of the alternative standards. Norman knew or should have known of the FBAR requirement and acted recklessly in failing to file it. She was willfully blind to her duty to file an FBAR. And she acted voluntarily in failing to disclose her UBS account to the United States.

### 1. Norman recklessly failed to file a 2007 FBAR.

In *Safeco*, the Supreme Court held that, for statutory civil liability, it has "generally taken [willfulness] to cover not only knowing violations of a standard, but reckless ones as well." *Id.* at 57. The government can establish willfulness by showing "the individual's reckless disregard of a statutory duty." *McBride*, 908 F. Supp. 2d at 1204 (citing *Safeco Ins. Co.*, 551 U.S. at 57); *see also Kobus*, 103 Fed Cl. at 588 (holding that a taxpayer may act "willfully" under I.R.C. § 6672 if "he acts with a reckless disregard of the facts and obvious and known risks that presently-due withholding taxes are not being paid"). The government does not need to show "an improper motive or bad purpose" to sustain a willfulness civil FBAR penalty. *McBride*, 908 F. Supp. 2d at 1204. Reckless disregard, in turn, occurs when "'the facts and circumstances of a particular case, taken as a whole, demonstrate' that the taxpayer 'knew or should have known that there was a risk [of noncompliance] and failed to take available corrective action,' with the result being the violation of the law." *Id.* at 1209 (quoting *Jenkins v. United States*, 101 Fed. Cl. 122, 134 (2011), internal quotation marks omitted, amendment in original).

As a matter of law, all taxpayers who sign and file a federal tax income return know or should know about the requirement to file an FBAR. "It is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS." *McBride*, 908 F. Supp. 2d at 1206 (citing cases). Courts have also long held that "'individuals are charged with knowledge of the contents of documents they sign—that is, they have "constructive knowledge" of these documents.'" *Id.* (quoting *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000)). As a corollary to this notion, "[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." *Williams*, 489 Fed. Appx. at 659 (quoting *Greer v. Comm'r*, 595 F.3d 338, 347 n. 4 (6th Cir. 2010)). Thus, the act of signing the return puts a taxpayer on notice of the contents of the entire return, as it would for any other document.

Schedule B, Part III, Line 7a, of a Form 1040 contains a question asking "[a]t any time during [a particular year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1." This simple yes-or-no question "makes it inconceivable that [a taxpayer] could have misinterpreted this question." *McBride*, 908 F. Supp. 2d at 1208 (quoting *Thomas v. UBS AG*, No. 11C4798, 2012 WL 239866, *5 n. 2 (N.D. Ill. June. 21, 2012), amendment in original). For that reason, three recent cases have held that taxpayers acted recklessly where they signed tax returns answering the question "No," despite knowledge that they had interests in foreign bank

accounts. *See id.* at 1211; *Williams*, 489 Fed. Appx. at 659; *United States v. Bohanec*, No. 2:15-cv-4347, 2016 WL 7167860 at *5 (C.D. Cal. 2016).[3]

Norman's situation is similar to these other three cases. As defendant will show, it is undisputed that Norman had constructive knowledge of the FBAR requirements, and she had both constructive and actual knowledge of her ownership of the UBS account. Yet, even with that knowledge, Norman failed to file a 2007 FBAR before the deadline; she falsely represented on her tax return, under penalties of perjury, that she had no foreign accounts; and she undertook various other actions evidencing a reckless disregard of her duties.

> **a.** **Norman had constructive knowledge of the FBAR requirement and actual and constructive knowledge of the UBS account.**

First, Norman had constructive knowledge of the FBAR requirement. On her 2007 income tax return, Norman signed and declared, "[u]nder penalties of perjury," that she had "examined the return and accompanying schedules and statements, and to the best of [her] knowledge and belief, they are true, correct, and complete." (Def. Ex. 17 at 5.) As previously explained, Norman represented that she had no interests in foreign bank accounts on Schedule B of the return, which also informed Norman of the existence of "filing requirements for Form TD F 90-22.1" (Def. Ex. 17 at 7.). Thus, even if Norman may not have had actual knowledge of the FBAR filing requirement, the tax return provided Norman with constructive knowledge of it.

Second, Norman had actual knowledge of her UBS account. By her own admission at her deposition, Norman knew she had ownership of the funds in her own account at UBS and had signatory authority over that account. (Def. Ex. 34 at 30:21–31:18, 32:25–33:2, 53:12–55:4, 130:8–16, 140:19–141:7, 142:23–143:5, 144:1–16, 155:4–18.) She spoke to her banker,

---

[3] A fourth recent case, *Bedrosian v. United States*, No. 2:15-cv-05853, 2017 WL 3887520 (E.D. Pa. Sept. 5, 2017), held that the taxpayer there had not acted willfully under 31 U.S.C. § 5321(a)(5). That taxpayer, however, had answered the same question on his tax return "Yes."

Thomann, and other UBS officials who managed her accounts. (Def. Ex. 28; 34 at 46:16–47:12

(conversations with Thomann), 48:12–22 (discussion with Lutoff), 65:11–66:7 (meeting

Lutoff).) She even received a withdrawal of cash from the account, which Thomann delivered to

her in person Thomann. (Def. Ex. 34 at 53:12–55:4.)

Third, Norman also had constructive knowledge of her ownership of the UBS account.

There are numerous documents related to the UBS account with Norman's signature, which put

her on constructive knowledge of her ownership of and control over the UBS account. (*See* Def.

Exs. 1 (document opening UBS numbered account with master number 206704272); 2

(Beneficial Ownership of UBS Account 206704272); 3 (Asset Management Agreement Nov. 13,

2003); 4 (Portfolio Management Agreement); 5 (document showing waiver of right to invest in

U.S. securities); 7 (documents handwritten by UBS official outlining transactions for UBS

Account 206704272); 8 (Asset Management Agreement Jun. 27, 2005); 9 (Asset Management

Agreement Dec. 13, 2005); 10 (Asset Management Agreement Jun. 12, 2007); 11 (General

Power of Attorney for UBS Account 206704272); 15 (document closing UBS Account

206704272 and transferring funds to account at Wegelin & Co. dated Jul. 8, 2008).) Norman's

testimony that she never looked at the documents she signed in connection with her UBS

Account (*see* Def. Ex. 34 at 131:25–132:20.) is irrelevant, because her constructive knowledge

of the documents' contents is sufficient to establish that she acted willfully. *McBride*, 908 F.

Supp. 2d at 1206.

### b.  Norman falsely answered a question on Schedule B of her tax return and she failed to review her return before filing it.

With constructive knowledge of the requirement to file the FBAR and both actual and

constructive knowledge of ownership of her UBS account, Norman acted recklessly in numerous

ways. First, even though she knew or should have known about her foreign account and the

requirement to file an FBAR disclosing the account, she checked the "No" box on Schedule B of her return and failed to file an FBAR before June 30, 2008. (Def. Ex. 17 at 9.) Second, like the defendant in *McBride*, Norman signed "under penalties of perjury" that the she had reviewed her return and that all the statements contained within "were complete and accurate," when in fact the return falsely stated that she had no foreign accounts. (Def. Ex. 17 at 5.) Third, like the defendants in *Williams* and *Bohanec*, Norman acted recklessly by signing and filing her return without reviewing it. (Def. Ex. 34 at 108:6–109:17.) These undisputed facts, by themselves, support a determination that Norman acted willfully, which the Court may reach on summary judgment rather than at trial.

### c.   Other undisputed facts bolster the conclusion that Norman acted willfully.

As explained, it is undisputed that: (1) Norman knew she had her own Swiss bank account; (2) Norman failed to report her interest in the account on a timely FBAR; and, (3) Norman falsely represented on her tax return that she had no foreign bank accounts. Those facts alone compel a conclusion that Norman acted recklessly, and therefore, willfully. But there are additional facts that further establish Norman's recklessness. They include Norman's lack of candor and completeness during her discussions with Saul and Kay, her U.S. accountants. They also include Norman's dishonesty during her communications with the IRS.

**Communications with Saul and Kay.** Norman's failure to provide candid and complete information to Saul (who prepared her 2007 return) and Kay (who prepared her 2008 return) demonstrates her recklessness. By Norman's own admission, for the 2007 tax year, she merely handed to Saul and his firm a bunch of documents, asked them to put together her return, and signed and filed the return without review. (Def. Ex. 34 at 107:6–16, 108:6–109:17, 110:11–22.) Norman never informed Saul of the UBS account before he prepared her original 2007 return.

19

(Def. Ex. 35 at 16:14–16.) If Norman had informed Saul of the UBS account, he would likely have advised Norman to report it, or he at least would have investigated further. (Def. Ex. 35 at 9:25–10:17, 22:9–23:13.) Saul also had a regular practice of issuing a tax organizer for his clients to complete, following up if information was missing. (Def. Ex. 35 at 11:15–12:6, 15:12–15.) Saul's tax organizer would have asked Norman whether she had any foreign bank accounts. (Def. Ex. 25 at 17, 27; 35 at 26:4–24.) It is also clear that Norman never advised Saul of foreign-sourced interest, dividends, and capital gains that she earned in 2007, which were omitted from her original 2007 return. (*Compare* Def. Ex. 17 at 7–10 *with* Def. Ex. 18 at 2–6.) If Norman had been candid with Saul about the foreign income she earned from her UBS account, he could have advised her of her FBAR obligations in connection with that account.

Norman was also reckless in her failure to be honest with Kay. Kay was aware of the FBAR reporting requirements because he had prepared FBARs for other clients. (Def. Ex. 36 at 11:11–12:3, 13:13–22.) Yet, in spite of her knowledge of the UBS account, Norman failed to tell Kay about the account during the preparation of her original 2008 tax return. (Def. Ex. 36 at 18:11–19:6.) This led Kay to prepare a return with the question on Schedule B marked "No." (Def. Exs. 26; 36 at 18:11–19:6.) It was only after she did a "quiet disclosure" with Kraft that Norman revealed the foreign bank accounts to Kay. (Def. Ex. 36 at 16:2–13, 23:23–24:3.) If Kay had known of the UBS account, Kay would have advised Norman to file an FBAR.

**Norman's dishonesty with the IRS.** Norman's false statements to the IRS during the audit process further evidences her recklessness. Both in her initial interview with a revenue agent and in a written statement prepared by Kay, Norman represented that she "did not know about the account until 2009, when her mother told her about the existence of such account and the need to report it on the tax returns." (Def. Ex. 19.) That statement was demonstrably false. It

was contradicted by the wealth of documentary evidence of Norman's repeated involvement with the account as early as 2003 or 2004. (*E.g.*, Def. Exs. 2; 3; 7 at 1; 28.) Thus, Norman could not have been, as she told the IRS, "shocked to first hear about the existence of the foreign accounts" from her mother "sometime in 2009." (Def. Ex. 19.)

Not surprisingly, Norman admitted in her second written statement that she had previously made "several misstatements" to the IRS. (Def. Ex. 21 at 2.) But even that *mea culpa* was misleading and incomplete. Although Norman was then willing to admit that she had known of the UBS account for "more than a decade" and that she "had signing authority" over the account, she stated that "none of the money in the account was hers" and that she "did not consider herself to have any control over the account." (Def. Ex. 21 at 2.) But that, too, was deceptive, as Norman admitted during her deposition. (Def. Ex. 34 at 142:13–143:5.) Norman's second statement failed to advise the IRS that she "had [her] own account" at UBS and that she considered the money in that account to be her own. (Def. Ex. 34 at 154:22–155:18.) It too, was inconsistent with the evidence that Norman had met with Thomann in person to discuss her account at least annually and that Norman had received a cash withdrawal from the account from Thomann. (Def. Ex. 34 at 46:16–47:12; 53:12–55:4.) Taken together, Norman's numerous deceptive statements to the IRS constitute further evidence of her awareness that her ownership of the UBS account was wrongful in some respect under U.S. law, which supports a determination that she acted recklessly in failing to file the FBAR.

### 2.   Norman acted with willful blindness to her duty to file a timely FBAR.

To allow an individual to claim she was subjectively unaware of either the FBAR requirement or the relevant facts by intentionally avoiding such knowledge would undermine the enforcement value of the civil FBAR penalty. For that reason, the government may prove that a taxpayer acted willfully without actual knowledge if he or she exhibited willful blindness.

*McBride*, 908 F. Supp. 2d at 1210. To be willfully blind "a [person] must subjectively believe that there is a high probability that a fact exists and the [person] must take deliberate actions to avoid learning of that fact." *Id.* (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011)); *see also Kobus*, 103 Fed. Cl. at 588 (in trust-fund recovery case, a responsible person may not "immunize himself from the consequences of his actions by wearing blinders which will shut out all knowledge of the liability for and the nonpayment of his withholding taxes").

In *McBride*, the district court found that the taxpayer was willfully blind to an obvious risk of failing to comply with the FBAR requirement, and thus willful in his failure to file an FBAR. *McBride*, 908 F. Supp. 2d at 1210–14. In reaching this conclusion, the district court held that the taxpayer's deliberately engineered investment arrangement and conversations with others had put him on notice that he had legal risk in connection with his foreign accounts. *Id.* at 1210–11. The fact that the taxpayer's returns had the obvious question regarding foreign accounts on Schedule B served to notify the taxpayer about the risk of failing to comply. *Id.* at 1211. The taxpayer's decision to sign his return without understanding its contents constituted willful blindness. *Id.* at 1212–13. Additionally, the taxpayer had made himself willfully blind by failing to disclose all relevant information to the accountant that prepared his return. *Id.* Here, as well, the undisputed evidence shows that Norman acted with willful blindness of her obligation to file the FBAR.

Norman's UBS account was a numbered account, which did not directly have her name attached (Def. Exs. 1; 2), and none of the bank statements included Norman's name. (Def. Exs. 12; 13; 14.) This allowed the account to remain quasi-anonymous; it hid Norman's identity as the owner from outsiders. Second, Norman signed a declaration stating that she was liable for U.S.

tax as a U.S. person, and that she waived her right to invest in U.S. securities. (Def. Ex. 5.) UBS

acted upon this waiver and extended it to subaccounts Norman established. (Def. Exs. 5; 6.) Had

Norman not waived her right to such investments, UBS might have been required to withhold

U.S. taxes, which would trigger U.S. reporting requirements. (Def. Ex. 5.) Third, Norman's

decisions to close her UBS account in 2008 and transfer the funds to a different Swiss bank, just

as UBS began cooperating with U.S. authorities, also evidences Norman's subjective concern

regarding her potential legal liabilities to the United States. (Def. Exs. 15; 16.)

Norman took deliberate steps to blind herself from knowledge of the FBAR requirement

itself and of the facts that might trigger the requirement. First, as in *McBride*, Norman claimed

that she never read the obvious question regarding foreign accounts on Schedule B of her tax

returns. (Def. Ex. 17 at 5, 9.) Second, Norman claimed that she did not read any of the

documents she signed related to her UBS accounts. (*E.g.*, Def. Ex. 34 at 69:10–70:7 (stating that

she signed UBS documents without reviewing them).) Third, Norman claimed not to have seen

the asset statements from her UBS account, and the statements themselves do not have

identifying information attached to them other than a client account number. (Def. Exs. 13; 14;

*see also* Def. Ex. 34 at 90:19–21.) Thus, Norman deliberately hid from key facts that would have

revealed her obligation to file an FBAR for the 2007 year.

Furthermore, as in *McBride*, Norman's failure to inform her U.S.-based accountants

about the existence of the UBS account evidences her willful blindness. Norman admitted that

she knew she had a UBS account, in which she considered the money to be hers. (Def. Ex. 34 at

154:12–155:18.) But she never told either Saul or Kay about the foreign bank account or that she

had earned foreign income in connection with the account. She furthered the deception by hiring

Kraft, an accountant in Switzerland, to perform a quiet disclosure behind the backs of her U.S.

accountants. (Def. Exs. 18; 27; 35 at 11:15–12:6, 15:12–15; 36 at 15:15–25, 16:2–13, 18:11–19:6, 20:1–21:2, 22:3–23:12, 23:23–24:3.) Norman's failure to inform her accountants about her Swiss bank account demonstrates her effort to blind herself from her legal obligations under U.S. law.

### 3. Norman's failure to file her FBAR was voluntary, rather than accidental.

A third ground on which courts have found willfulness in the FBAR context is a "voluntary, rather than accidental or unconscious" decision by a taxpayer not to file the report. *McBride*, 90 F. Supp. 2d at 1205 (*citing Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997)); *see also Estate of Liftin v. United States*, 111 Fed. Cl. 13, 19 (2013) (citing *United States v. Boyle*, 469 U.S. 241, 245 (1985)) (stating that willful neglect in a failure to file case is "conscious, intentional failure or reckless indifference"); *aff'd*, 754 F.3d 975 (Fed. Cir. 2014).

In *McBride*, the district court found that the taxpayer's failure to file an FBAR was voluntary and not accidental. *Id.* at 1213. The district court reasoned that the taxpayer had signed his tax returns, which provided him with constructive knowledge of his duty to file the FBAR. *Id.* But the taxpayer chose not to disclose his interests in foreign accounts. *Id.* The fact that the taxpayer had a mistaken belief that he did not need to disclose his foreign accounts was irrelevant. *Id.* (quoting *Lefcourt*, 125 F.3d at 83). All that mattered "is whether the law required its disclosure" and whether he voluntarily failed to comply. *Id.* (quoting *Lefcourt*, 125 F.3d at 83).

Here, many of the undisputed facts that establish Norman acted recklessly also prove that she acted voluntarily. As stated above, Norman had constructive knowledge of the FBAR requirement, because she signed her original 2007 tax return, which included the question on foreign bank accounts on Schedule B. (Def. Ex. 17 at 5, 9.) Norman had both actual and

constructive knowledge of the UBS account, based on her signature on various UBS documents and her testimony that she knew about the account. (*E.g.* Def. Exs. 1; 2; 7; 15; 28; 34 at 53:12–55:4, 142:23–143:5, 155:4–18.) Thus, as in *McBride*, Norman knew she had a foreign bank account and a duty to report that account.

Yet, even with that knowledge, Norman chose not to file a 2007 FBAR by June 30, 2008. She chose not to disclose the UBS account to either Saul or Kay. (Def. Exs. 35 at 9:25–10:17, 16:14–16, 22:9–23:13, 26:4–24; 36 at 12:4–23, 15:15–25, 18:11–19:6, 26:16–19.) Had she done so, either could have helped her file FBARs or take proper corrective action.

The response by Norman to the investigation of UBS by U.S. authorities also shows that her failure to file was voluntary and not accidental. Around April 2008, when the government's investigation of UBS was advancing, UBS told Norman that it was adopting a new business model. (Def. Ex. 28 at 2.) Norman expressed unhappiness about the arrangement. In light of these changes, Norman, on July 8, 2008, asked UBS to close her UBS account and transfer the funds to an account at Weglin, which was not cooperating with the U.S. authorities at the time. (Def. Exs. 15; 16; 34 at 97:7–98:12.) This act evidences a voluntary decision by Norman to conceal her foreign account from U.S. authorities, rather than an accidental failure to file the requisite report.

Finally, Norman's significant misstatements to the IRS and in her Complaint also demonstrates that she voluntarily chose not to file her 2007 FBAR. If her failure had been accidental, Norman would not have misled the IRS about her knowledge of the account, continually changing her story when it conflicted with the documentary evidence. (Def. Exs. 19 at 6, 8; 20; 21 at 2–3; 34 at 53:12–55:4, 142:23–143:5, 155:4–18; Dkt. No. 1 ¶¶ 12, 14, 23.)

Rather, Norman would have most likely admitted that her failure was inadvertent without weaving a complex and shifting story.

**C.  Norman's failure to file an FBAR is not excused by reasonable cause.**

In her Complaint, Norman suggests that "a minimal penalty should be imposed" based in part "upon advice of the Swiss bankers." (Dkt. No. 1, ¶ 23.) To the extent that Norman is suggesting that there was reasonable cause for her failure to file the FBAR, that claim is without merit.

Under 31 U.S.C. § 5321(a)(5), the FBAR civil penalty has two varieties, a non-willful penalty under subsection (a)(5)(B), and a willful penalty under subsection (a)(5)(C). The statute includes a reasonable-cause exception, which applies *only* to the non-willful penalty under subsection (a)(5)(B). In discussing the willful penalty under subsection (a)(5)(C), the statute explicitly says that "subparagraph (B)(ii) [the reasonable-cause exception] shall not apply." Thus, Congress expressly denied a reasonable-cause defense to a taxpayer such as Norman who was assessed a willful FBAR penalty.

Separately, Norman may not claim reasonable cause based on advice by foreign bankers as to how best to evade U.S. taxes. Indeed, where tax advice comes from a source with an inherent conflict and is "too good to be true," it is not objectively reasonable and cannot support a reasonable-cause defense. *See Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1381–82 (Fed. Cir. 2010). The advice given from the very Swiss bankers who helped Norman evade her U.S. taxes and her reporting obligations is not objectively reasonable and cannot therefore support a claim of reasonable cause.

**D.  Norman's failure to take advantage of OVDP to reduce her potential FBAR penalties is irrelevant.**

In her Complaint, Norman alleges that her Swiss accountant "failed to inform her of" both "the potential penalties" for failing to file the FBAR and the existence of "OVDP," and that, for some reason, that failure should excuse Norman's behavior. (Dkt. No. 1, ¶¶ 21, 23.) While any such omission by Norman's Swiss accountant might be relevant in a malpractice action against him, it has no effect on Norman's liability for FBAR penalties. A taxpayer's proper participation in the Offshore Voluntary Disclosure Program does not negate his or her willful failure to file the FBAR; it merely exercises the discretion of the IRS to reward the taxpayer's cooperation by reducing the discretionary penalty assessed by the agency. For a number of reasons, OVDP provides no defense to the penalties at issue here.

First, despite Norman's equivocal testimony that she thought she was participating in the "voluntary disclosure thingy program," which was "supposed to—you know—take care of it," the documentary evidence makes clear that she did not actually participate in the program and could not have reasonably believed that she was doing so. (Def. Ex. 34 at 119:4–121:19.) Both U.S.-based accountants that Norman used during relevant times, Saul and Kay, knew about OVDP. (Def. Exs. 35 at 11:2–13; 36 at 12:24–13:12.) Saul even said that his firm had advertised about OVDP as a service. (Def. Ex. 35 11:2–13) Either could have helped Norman enter OVDP or refer her to someone who could complete the process. Instead, Norman went to Kraft, a CPA living in Switzerland, outside the jurisdictional reach of the U.S., referred by her UBS banker. (Def. Exs. 30; 34 at 114:7–23.) Norman did this behind the back of her U.S. accountant at the time, Kay, and only told him about the UBS account and her actions after the fact. (Def. Ex. 36 at 20:1–21:2, 22:3–23:12.) Such actions evidence Norman's intent to avoid cooperation with the IRS, rather than an attempt to enter into OVDP. Moreover, the "professional services rendered"

by Kraft merely involved the preparation of amended returns with a direction to Norman to pay back taxes. (Def. Ex. 30.) The correspondence said nothing about OVDP, nor did it discuss the payment of any penalties to the IRS, which would have been necessary if Norman was a participant in the program.

Second, Norman never satisfied the requirements to be granted leniency under the program. Norman never expressed a willingness to cooperate with the IRS and make good faith arrangements to pay all taxes, penalties, and interest that she would owe. *See* OVDP Q&A No. 6. Indeed, Norman's numerous false statements to the IRS during her audit demonstrate that she failed to "truthfully, timely, and completely" comply with the program's requirements, rendering her ineligible to receive the program's benefits. OVDP Q&A No. 4, 50.

Third, because OVDP is a discretionary program, Norman has no legal remedy against the United States for her failure to receive leniency under the program's terms. After a taxpayer notifies the IRS that he or she wishes to enter into OVDP, the IRS exercises its discretion in determining whether to accept that person into OVDP, or instead refer the case to the standard criminal and civil enforcement procedures. OVDP Q&A No. 1. A taxpayer has no right to participation in OVDP, nor does the taxpayer have any "substantive or procedural rights" under the IRS's voluntary disclosure practice. I.R.M. § 9.5.11.9.

Notably, the Supreme Court in *Heckler v. Chaney*, held "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The District of Columbia Circuit has applied this principle to an agency's decision to settle an enforcement action. *Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1031 (D.C. Cir. 2007). The D.C. Circuit upheld a global settlement program similar to the 2009 OVDP, reasoning that a

broader settlement strategy "would lead to quicker industry-wide compliance. These judgments—arising from considerations of resource allocation, agency priorities, and costs of alternatives—are well within the agency's expertise and discretion." *Id.* at 1031–32 (internal citations omitted).

The statute at issue here provides that the Secretary "*may* impose a civil money penalty" for failing to file an FBAR. 31 U.S.C. § 5321(a)(5)(A) (emphasis added). Thus, the statute falls within the ambit of *Heckler v. Chaney*. Additionally, OVDP itself is a program that forgoes some of the discretionary enforcement power of the IRS under the statute, like the settlement program in *Association of Irritated Residents*. It thus follows that a rejection from OVDP is not reviewable, and, likewise, Norman's suggestion that she had attempted to apply to OVDP, but failed because of Kraft's mistakes, cannot give rise to any procedural or substantive rights.

## VI.   CONCLUSION

The undisputed evidence establishes that Norman failed to file a timely FBAR for the 2007 year, despite her admitted knowledge of her own Swiss bank account. In failing to file the report, Norman acted recklessly, acted with willful blindness, and acted voluntarily, and thus was willful. Moreover, Norman's suggestions that her penalty should be reduced due to reasonable cause or OVDP are without merit. Thus, the Court should grant defendant's motion and enter judgment in defendant's favor on the claims in Norman's complaint.

//

//

//

//

//

//

29

Respectfully submitted,

November 09, 2017                    */s Blaine G. Saito*
Date                                BLAINE G. SAITO
                                    Attorney of Record
                                    U.S. Department of Justice
                                    Tax Division
                                    Court of Federal Claims Section
                                    Post Office Box 26
                                    Washington, D.C. 20044
                                    202-353-7125 (v)
                                    202-514-9440 (f)
                                    Blaine.G.Saito@usdoj.gov

                                    DAVID A. HUBBERT
                                     Acting Assistant Attorney General
                                    DAVID I. PINCUS
                                     Chief, Court of Federal Claims Section
                                    JASON BERGMANN
                                     Trial Attorney, Court of Federal Claims Section


                                    */s Jason Bergmann*
                                    Of Counsel